**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-24-00290-CV**
_____

**IN THE INTEREST OF A.D.-P., J.E.-D., and S.E.-D.**

**On Appeal from the County Court at Law No. 3**
**Montgomery County, Texas**
**Trial Cause No. 23-06-08814-CV**

**MEMORANDUM OPINION**

Following a bench trial, K.D.-P. ("Mother") appeals the trial court's order terminating her parental rights to her minor children, A.D.-P. ("Amanda"), J.E.-P. ("Jacob"), and S.E.-P. ("Sue") based on Texas Family Code subsections 161.001(b)(1)(D), (E), (O) and a finding that termination was in the children's best interest.[1] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (O), (2). The trial court also terminated the parental rights of Amanda's alleged father, "Justin," and Jacob

---

[1] In parental rights termination cases, to protect the identity of the minors, we refer to the children by a pseudonym or initials and family members by their relationships to the children. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2). At the time of the trial the children were ages 10, 9, and 5.

1

and Sue's father, "Oliver," but they are not parties to this appeal. In four issues, Mother challenges the legal and factual sufficiency of the evidence supporting the termination grounds specified in sections 161.001(b)(1)(D) and (E) and that termination was in the children's best interest. *See id.* § 161.001(b)(1)(D), (E), (2). Mother also challenges the trial court's appointment of the Department of Family and Protective Services ("the Department") as permanent managing conservator. Mother does not challenge the termination based on predicate ground O, which is failure to follow a court-ordered service plan. *See id.* § 161.001(b)(1)(O). We affirm.

## BACKGROUND AND FACTS LEADING TO REMOVAL

In June 2023, the Department filed its Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent-Child Relationship naming Amanda, Jacob, and Sue as the subjects of the suit and seeking to terminate Mother's and the two fathers' parental rights. The Department included Investigator Rebecca Owen's ("Owen") Affidavit in Support of Removal with the Petition. Owen outlines a report they received in May 2023 regarding alleged sexual abuse of Amanda by Oliver. Owen explains that Mother and other family members discussed what they would report about Oliver after they observed injuries to Amanda's "anal area." The report also included information that Oliver and Mother use methamphetamines, and Oliver is Mother's drug dealer.

2

Owen states that two days after the initial report, the Department received another report alleging sexual abuse of Amanda by Oliver and additional concerns that Amanda was sexually abused by Mother's ex-boyfriend, Justin. Owen explains that the report alleges Amanda disclosed being touched inappropriately by three of Justin's friends and that Oliver and Justin "have both exposed their penis to the child[.]" Owen notes that "[t]here are concerns noted for [Mother] believing the outcry of the child."

Owen asserts that in June 2023, the Department received another report that Mother, Sue, and Jacob were seen walking down the street while Mother was intoxicated and that they would have had to cross the road at some point, exposing them to possible injury. According to the report, law enforcement took Mother and children to the address on the report.

Owen explains that on May 15, 2023, all three children underwent forensic interviews, and the main outcry of abuse was Amanda's, which led to concerns for the younger, more vulnerable children. During her interview, Amanda made disclosures of sexual abuse by multiple men, including Oliver and Justin. The affidavit reveals the sexual abuse allegations Amanda described in her interview by Oliver, Justin, and Justin's brothers. Owen also states that Amanda told the interviewer that Oliver "uses a dollar bill or straw to put the white stuff in his nose." Owen describes Amanda saying she saw Justin touch Sue inappropriately. Owen

avers that Amanda told investigators she reported the sexual abuse by Justin to Mother, who said she would call the police but never did and that Mother confronted Justin, who denied the allegations.

Owen states in her affidavit that on May 15, 2023, she and Special Investigator Daniel Kingsley interviewed Mother, who denied knowing about the sexual abuse before Sunday. Mother told them that Amanda "began talking about being touched by [Oliver] and that her anus was sore and burning[,]" and "that she saw [Amanda's] anus to be red with cut marks." Mother said "law enforcement was called, and all three children had SANE exams[,]" and that the "children would not have contact with [Oliver] or [Justin]" while the investigation was pending. Owen also discusses a prior warrant out of Florida for Mother pertaining to a child and a family services case there where she refused to cooperate and left the state prior to the criminal court date.

Owen also describes conversations she had with Detective Ramon Ramos about his contact with Mother. Ramos told Owen that he met with Mother, who denied that Amanda ever disclosed abuse to her and denied that Amanda showed her a video of Justin abusing her. Mother admitted to Ramos that Oliver uses marijuana and "crystal meth."

The Affidavit also described Mother's history with the Department beginning in 2021 involving allegations that Mother and Justin engaged in drug use, excessive

drinking, and Mother took Amanda to the emergency room for suspected sexual abuse. Since Mother and Justin refused to cooperate with drug testing, that case was ruled "unable to determine." From September 2022 through February 2023, there were concerns of neglect by Mother due to excessive drinking and erratic behavior while caring for the children and complaints that she was walking on a highway ramp with the children while under the influence.

Owen concludes her Affidavit by asking that the Department be appointed the children's temporary managing conservator given Mother's demonstrated "inability to protect her children from people who have been abusive and has continued to place her children in dangerous situations while under the influence." On June 20, 2023, the trial court signed an Order for Protection of a Child in an Emergency, appointing the Department as the children's temporary sole managing conservator.

TRIAL EVIDENCE[2]

Mother appeared at trial both days with her court-appointed counsel and an interpreter.

Testimony of Investigator, Rebecca Owen

CPS Investigator Owen testified that she was assigned the case in May 2023, when the case began. Owen said that on May 15, 2023, they received a call to

---

[2]We limit our discussion of the trial evidence relevant to the challenged grounds on appeal. *See* Tex. R. App. P. 47.1.

5

investigate allegations that the oldest child, Amanda, had been sexually abused. She contacted the family that day, and all three children underwent forensic interviews at Children's Safe Harbor. When she met Mother, Owen said that Mother described a prior incident that occurred in Florida where she was walking down a freeway with the children while intoxicated. On May 15, Mother also told Owen that Amanda complained to her about sexual abuse. Mother also told her a couple of days later, while investigating, they received a second call relaying the same sexual abuse allegations. Owen explained that they were still investigating when they received a third call on June 19, 2023, alleging neglectful supervision by Mother and specifically that she was walking down the highway with the children in the middle of the night while intoxicated. Mother told Owen that she left a get-together where she had been drinking and was walking down the highway, but a sheriff's deputy stopped her and brought her home. She said that Mother admitted having drug and alcohol problems.

As to the sexual abuse allegations by Amanda, Owen testified that after the children's forensic interviews on May 15, 2023, Mother was protective. At the end of that day, they released the children into Mother's care, and they were ultimately removed on June 20, 2023. In that intervening month, Owen continued her investigation by speaking with Oliver, Mother, and law enforcement.

Owen testified that she interviewed Oliver, who is Jacob's and Sue's father. Oliver told Owen there were multiple domestic violence incidents between him and Mother that occurred with the children present. Oliver told Owen that he used methamphetamines. Oliver did not offer specifics of Mother's drug use, but he expressed concerns about her alcohol and drug use.

Owen testified she visited the home, a two-bedroom trailer, which she described as "pretty empty[]" with furniture only in one bedroom. She explained there was not much food in the home, and she was concerned the children did not have enough to eat. At the time, the children lived in the trailer with Mother and her boyfriend, who was covering all the expenses.

Owen testified that CPS removed the children, because they learned later in the investigation that Mother was not protective of them regarding the sexual abuse and due to the neglectful supervision allegations. She explained the lack of protectiveness, coupled with Mother being found intoxicated with the children in a public place were the reasons for removal.

Testimony of Forensic Interviewer, Kelly Garcia

Kelly Garcia ("Garcia") is a bilingual forensic interviewer for Children's Safe Harbor who testified at trial. Garcia testified that she interviewed Amanda. Garcia described her educational background and training, then described the protocols involved in conducting forensic interviews of children. Garcia testified that she

followed those protocols when interviewing Amanda and noted that she has conducted over 2,000 interviews.

Garcia explained that she interviewed Amanda on May 15, 2023, for two hours and twenty-four minutes. Garcia testified that during the interview, Amanda made outcries of abuse, which Garcia characterized as "offenses." Garcia noted that Amanda made eleven outcries during the interview. Garcia testified that Amanda talked about different offenses with multiple perpetrators, and the first perpetrator was Oliver. Garcia also relayed in detail Amanda's allegations of the various ways Oliver sexually assaulted her. Garcia explained that Amanda related other allegations against Oliver during the interview, but Amanda could not provide a timeline.

During the interview, Amanda also described multiple sexual offenses committed against her by Justin. Garcia testified that Amanda described Justin sexually assaulting her in a bathroom upstairs and described him sexually assaulting her on multiple occasions in multiple ways. She told Garcia that Justin assaulted her on one occasion after Mother left for the store and another time while Mother "was downstairs cooking sausage." Amanda also told Garcia that Justin's two brothers sexually abused her, one whom she described as "skinny" and the other as "fat." Amanda described one instance to Garcia where Justin and his skinny brother assaulted her at the same time "while fat brother was present[,]" but they "stopped

8

because Mother came back from her house." Garcia testified that Amanda then told her about two other instances when Justin assaulted her, once while Mother was downstairs and another time in her bedroom while Mother was at the store.

Garcia explained that in total, Amanda said there were four alleged perpetrators including Oliver, Justin, and Justin's two brothers. Many times, when the abuse occurred, Amanda said Mother was not there and provided some level of detail about that. Garcia testified that Amanda's demeanor "was very open. She was all over the place and happy. Content. And just open." Amanda did not provide Garcia with a timeline but provided a location for some offenses. Garcia explained that Amanda provided details about locations including identifying one home as "having two pools[,]" and the clothing she was wearing when she was assaulted.

Amanda told Garcia that Mother was in the home when the abuse occurred but was not in the room. Garcia testified that Amanda reported telling Mother about the sexual abuse.

Testimony of Conservatorship Worker, David Rendon

David Rendon ("Rendon") is the assigned conservatorship worker and has been on the case for a year. Rendon testified that he is bilingual and communicates with Mother in Spanish.

Rendon testified that a family plan of service was developed for Mother, which included a parenting class, a psychological assessment, substance abuse

9

assessment, random drug tests, and maintaining a stable living environment and employment. Throughout the case, Mother never provided specifics or an address of where she was living and at one time told Rendon she was living in her truck. Rendon said that Mother never provided any information about her employment, although the plan required it, and he discussed it with her. Mother completed a parenting class and psychological evaluation. The psychological evaluation recommended she undergo random drug assessments, use CPS resources, and complete a substance program.

Rendon said that Mother was scheduled for a drug assessment multiple times, but she did not actually complete it. According to Rendon, they explained to Mother that if she failed to go for drug tests when called, those tests would be considered positive. He testified there were about ten times he called her to test, but she failed to go, and he estimated she tested less than fifty percent of the time. Most of the time, her excuse was that she forgot about the test and occasionally, she said she had transportation issues.

Although Mother initially denied drug use, she later admitted it during one of the visits. Rendon testified that Mother tested positive for amphetamines and methamphetamines several times during the case. Rendon said he spoke with Mother about her positive drug test results, and about half the time she admitted using, and the other half, she stayed quiet. She also tested positive for alcohol when the case

began. Mother never told Rendon that she felt she had an alcohol problem but did say alcohol was one way she coped and released stress. Rendon explained that for a while Mother was not allowed access to her children until she provided a negative urine analysis ("UA"), which took about three or four weeks. According to Rendon, Mother told him recently that she would no longer participate in drug testing, because she did not believe it would help her; she believed she needed rehabilitation instead.

Rendon testified that the first time Mother attempted to go into a drug program for the Department was April. The Department tried to accommodate Mother for the drug program with Spanish speakers. Rendon explained that Mother had not officially completed any substance program but attempted to go; she left one facility, Santa Maria, "against professional advice." He said that Mother left Santa Maria, because she believed she was not getting the necessary help. Rendon testified that Santa Maria had Spanish speakers, and one person was specifically assigned to Mother. She left Santa Maria at the beginning of June and hasn't entered any rehab since, and last drug tested in April or early May. Mother was also discharged from individual therapy at Reflexiones for multiple no-shows.

Rendon believed that Oliver was the younger children's father and said that he did not talk to Mother about staying away from him. In March 2024, Mother and Oliver were arrested on the way to a casino in Livingston; Oliver had drugs and a

weapon in a backpack and would be deported. This occurred during the time Mother was prohibited from visiting the children until she had a clean UA. While Mother was at Santa Maria, she asked Rendon to talk to her counselor so she could get permission to visit Oliver in Immigration and Customs Enforcement ("ICE") custody.

Rendon testified that he observed most of Mother's visits with the children, and during one of the last visits, Mother had inappropriate conversations with Amanda. This involved Mother telling Amanda that she needed "to tell the truth. That she's the only one that can save this family." During this conversation, Amanda was "stressed out" and crying. The Court Appointed Special Advocate ("CASA") was there, and they both repeatedly told Mother to change the conversation and ultimately threatened to end the visitation. Rendon testified that Mother has also been "extremely late" to visits. He also described Mother being late to a visit, because she was involved in a road rage incident in the middle of the night and someone shot at her car, so she had to speak with the Harris County Sheriff's Department. Rendon observed the bullet holes in her vehicle and photographs of the holes were introduced. He said that Mother did not explain why she was in the area where the shooting occurred late at night.

Rendon discussed the children, who are placed in "a basic foster home[,]" and their progress. He testified that all three children required summer school. The

children were behind on their vaccinations, and Amanda needed multiple rounds of shots for school.

Rendon testified that Amanda is ten and entering the fifth grade. He said that Amanda is in a special education program, receives accommodations, and makes Cs in school. He explained that Amanda has improved but is still delayed. Rendon testified that Amanda requires medications, including Clonidine and Desmopressin. She is in group therapy with her siblings and individual therapy, which includes skills training and trauma therapy. Rendon relayed that Amanda is doing well in therapy.

Rendon testified that Jacob is nine and entering third grade. He said that Jacob is doing "amazing" in school and made the honor roll every grading cycle. Rendon said Jacob is talkative, has no behavior issues at school, and is best friends with one of the other foster brothers in the home. Jacob is also in therapy, including trauma therapy and skills therapy. Rendon testified that Jacob gets along well with his siblings if they behave, but if they misbehave, he tries to "separate himself from the siblings."

Rendon said that Sue is five and will be in kindergarten. She is also in therapy. Rendon explained that Sue is doing better and talking more, while before, she did not want to speak to most people. At one point, the foster mother considered having Sue removed from the home due to her tantrums, but those behavior issues resolved.

13

Rendon testified that the Department feels the children should remain together. The Department's primary goal is related adoption, and the concurrent goal is unrelated adoption. They are looking into a fictive kin placement and awaiting the results of a home study. Rendon did not see any obstacles to the fictive kin placement, who is Oliver's friend, other than she was moving, so they'd have to do another home study, and there was a criminal history. The trial court questioned Rendon about the wisdom of placing the children with a friend of the man accused of sexually abusing Amanda. The only other possible family placement was Mother's sister, but the children were not placed there, because the husband strongly opposed the placement and her oldest child "had felonies."

Rendon testified that Mother had three boyfriends during the case, including Oliver, Justin and one other. He was unsure if Mother was still in a relationship with Oliver, but they were arrested together on their way to the casinos. Additionally, Mother told Rendon that she wanted the children's passports while she was at Santa Maria to take them on a trip to Hawaii. Mother told him multiple times that she wanted to take them out of state to "start new."

Rendon is concerned about Mother's drug use and ability to protect the children. Rendon testified it was in the children's best interest for Mother's parental rights to be terminated but did not "have an exact answer at the moment[]" for why.

14

He also testified all the fathers' parental rights should be terminated and that Oliver had signed an affidavit of voluntary relinquishment.

Mother's Testimony

Mother testified that although she made many mistakes, she wants what is fair and she has "fought" for her children. Mother did not believe she needed frequent drug testing, instead she needed CPS support to help her find a rehab and get her children back. Mother explained that while she was in the United States, Amanda was not always with her, rather Amanda came to the United States from El Salvador to be with Mother when she was five.

Mother said that since the Department has been involved, she has only been in one stable relationship, with her on-and-off-again boyfriend, "John." She denied being in a relationship with Oliver while the case was pending and said they separated four years ago. She testified that she went to the casinos with Oliver since "we always remained in contact as friends and because of the kids." She understood that Oliver was accused of sexually abusing Amanda but denied that Amanda ever told her that while she was in a relationship with Oliver, and she wanted to stay in contact with him for the children until the investigation concluded. She knew in May that Amanda made allegations against Oliver, but she explained that she was not in a relationship with him at that time, they were only friends.

15

Mother understood that Amanda alleged four perpetrators sexually abused her and during the interview, Amanda was talking about things that happened before May while Mother was Amanda's primary caregiver. Mother said that she had a relationship with Justin, and she knew his brothers. She testified that Amanda's description of a "skinny" brother and a "fat" brother made sense. She agreed that Amanda recounted through the forensic interviewer that she was sexually abused by Justin and his brothers multiple times. Mother testified she always took care of her children, but Amanda never let her know anything.

Mother denied leaving her children alone, except to go to the store. Mother said that Amanda never told her about the abuse until after the outcry, which was when she found out about everything. Mother testified that she sold sexual favors to men for money or drugs after separating from Justin, who abused Amanda, but she denied prostituting Amanda. When asked if she believed Amanda was sexually abused, Mother responded, "Now I do."

Mother testified that she is staying in a hotel and waiting to return to Santa Maria rehab. She said a man named "Jose" is providing funds for her to live in the hotel, but denied they are in a relationship and insisted he is just giving her support. Mother testified the only stable place she lived during the case was in an RV for two months, which her spouse, "Huston" paid for. She immediately contradicted this

16

testimony by saying she was not married, but they were in a relationship. She testified that now, a different man is supporting her.

Mother received a copy of the service plan in Spanish and completed the parenting class. Mother said she did not complete the tasks on the service plan, because they were not in Spanish. She completed the psychological evaluation, and Rendon told her there were recommendations from the evaluation. She said she completed a drug and alcohol assessment but not a substance abuse program. Mother reported that she has been unemployed since this case started. She attributed her lack of a stable home and job to needing to return to Santa Maria. Mother said that the month she spent at Santa Maria was hard, and she had witnesses who saw she was attacked because she did not speak English, yet she would return.

Mother said that if the Department returns the children to her, they would live in an apartment with only her. She testified that to keep Amanda safe, she would "protect them more." Mother acknowledged the children have improved physically and mentally while in the Department's care. If the children are not returned, Mother testified that she would like the children placed with a woman named Lily, who has supported her, but Mother seemed unsure of the woman's last name.

<u>Testimony of Court Appointed Special Advocate, Karen Vegas</u>

Karen Vegas ("Vegas") is the guardian ad litem and CASA for the children. She testified that she has been on the case since the beginning and is bilingual. Vegas first met Mother at Children's Safe Harbor in May of 2023.

Vegas said she spoke with Mother about Amanda's allegations of sexual abuse. According to Vegas, Mother talked to her about the sexual abuse allegations and knew that different men had been allegedly abusing Amanda; Mother "had her doubts about [Oliver], and she believed that [Justin] had done some sexual assault to [Amanda]."

Vegas testified she attended about fifteen of Mother's visits with the children. Vegas explained that there were issues with Mother's behavior at the visits, so Mother required redirecting. Vegas recalled one incident of Mother sharing how the current boyfriend had been in jail, which did not require much redirecting, though in later visits, it was more difficult to redirect Mother. Vegas explained that as they have tried to redirect Mother, she was "more in denial of listening to the instructions[,]" but overall, Vegas said "most of the visits were very positive for Mom and the children." Vegas said many visits "were very emotional" since they played certain music that had emotional meaning to them as a family, and Mother and Amanda often talked about how life was back in El Salvador with the children's grandmother.

Vegas testified she had "[m]ultiple conversations" with Mother about how to do her services and tried to help Mother get the proper services. Vegas testified that CPS provided Spanish-speaking providers to the best of its ability. Mother told Vegas that there was not a Spanish provider at Santa Maria. Vegas did not see any fault in CPS trying to accommodate Mother's needs and explained maybe twice during the case, a services voucher expired. Nevertheless, she and Rendon constantly talked to Mother about services and what she needed to do to set up appointments and complete her service plan. Vegas testified that Mother had difficulty completing her plan due to transportation issues, and virtual visits also were difficult since Mother did not have a stable phone or internet connection. Locating in person visits was hard, but the "biggest barrier was the language barrier[.]" Vegas explained that CPS provided the Spanish-speaking services that it could, but there were not many such services available. Vegas testified that Mother did not complete any services except her parenting class.

Vegas never saw any official paperwork showing Mother was employed during the case. According to Vegas, Mother provided different answers throughout the case about where she was living; she mentioned an RV, a hotel, and living in her car, but did not establish stable housing.

Vegas said Mother did not go to all her random drug tests. She talked with Mother about her drug use. Mother admitted to drinking occasionally but not having

a problem with alcohol and did not understand how she tested positive for methamphetamine, although she acknowledged using cocaine in the past.

Vegas testified that Amanda underwent a psychological evaluation and was diagnosed with depression. She said Amanda receives accommodations in school, including speech, since she had a speech delay and was held back a year in school based on her performance in an assessment, but Vegas could not recall a specific diagnosis. Vegas testified that she had seen "great progress[]" in Amanda and her speech has improved, she looks healthier, and is doing better academically. Vegas testified that Jacob has also made progress; he is more approachable, will speak, will make eye contact, and is more open. Vegas said that Sue has improved the most; she used to pull her hair out, but now has long, healthy hair, has gained weight, and speaks.

Vegas testified that Mother is from El Salvador, and Amanda has been in the United States since she was five. Vegas had spoken with Mother about Amanda's immigration status and was unclear exactly how she arrived in the United States, as she received different information, but she knew that Amanda's asylum status had expired.

Vegas agreed with the Department that the three children should be kept together. The Department does not have the results of the recent home study on the

fictive kin. The children's current placement is not an adoptive home, so they don't know where the children will end up.

Vegas testified that she spoke with Mother about Lily, Mother's proposed placement. Mother told Vegas that Lily was someone who supported her when she was on the streets, and she agreed to take the kids in. Vegas had also spoken with Lily and had concerns about placing the children with her. Vegas said she learned that Lily owns a restaurant where Mother worked and after hours, Mother would prostitute herself with Lily's help.

Vegas believed all parents' rights should be terminated. Vegas explained why she believed it was in the children's best interests for the fathers' rights to be terminated. Vegas also believed it was in the children's best interests for Mother's rights to be terminated. She explained that despite CPS and CASA support, since August of the previous year, Mother did not commit to doing what she needed to do to get her children back, was noncompliant, and Vegas believed that "terminating her parental rights is in the best interest of her children." Vegas did not believe Mother had learned anything that would make it a safe environment for Amanda especially.

Other Evidence

Documentary evidence admitted at trial included, among other things, the court's order incorporating the service plans, Mother's service plan, Mother's drug

21

and alcohol test results, Mother's counseling records from Reflexiones containing Mother's psychological evaluation with recommendations, and photographs of Mother's car showing bullet holes.

Trial Court's Ruling

The trial court found by clear and convincing evidence that the Department established termination grounds D, E, and O and that terminating Mother's rights is in the children's best interest and appointed the Department as the children's permanent managing conservator. The trial court adjudicated Oliver to be the father of Jacob and Sue and terminated his rights based on the affidavit of voluntary relinquishment and finding by clear and convincing evidence it was in their best interest. The trial court also terminated the rights of the alleged father, Justin, to Amanda and those of any unknown father.

Mother timely appealed.

STANDARDS OF REVIEW

The standard of proof required in cases involving termination of parental rights is clear and convincing evidence, which is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. §§ 101.007, 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012) (citing *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002)) (other citations omitted). Generally, only one

22

predicate finding under section 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003) (applying previous version of the statute); *see also In re M.S.*, 662 S.W.3d 620, 628 (Tex. App.—Beaumont 2023, pet. denied). Yet, when, as here, a parent challenges the endangerment findings under section 161.001(b)(1)(D) or (E), due process concerns and the requirement for a meaningful appeal dictate that we review these grounds. *See In re N.G.*, 577 S.W.3d 230, 236–37 (Tex. 2019) (per curiam); *In re C.M.C.*, 554 S.W.3d 164, 171 (Tex. App.—Beaumont 2018, no pet.).

When conducting a legal sufficiency review of the termination of parental rights, we examine all the evidence in the light most favorable to the finding to determine whether "a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266; *see also In re J.O.A.*, 283 S.W.3d 336, 344–45 (Tex. 2009); *In re M.S.*, 662 S.W.3d at 628. We assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could, and we disregard all evidence a reasonable factfinder could have disbelieved or found incredible. *In re J.O.A.*, 283 S.W.3d at 344–45; *In re J.F.C.*, 96 S.W.3d at 266; *see also In re E.N.C.*, 384 S.W.3d at 802; *In re M.S.*, 662 S.W.3d at 628. The evidence is legally insufficient if no reasonable factfinder could form a

23

firm belief or conviction that the matter that must be proven is true. *In re J.F.C.*, 96 S.W.3d at 266; *In re M.S.*, 662 S.W.3d at 628.

In a factual sufficiency review, we "give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing[]" and must determine "'whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations.'" *In re J.F.C.*, 96 S.W.3d at 266 (quoting *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002)). Considering the entire record, if the disputed evidence a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not have reasonably formed a firm belief or conviction, then the evidence is factually insufficient. *Id.* We defer to the factfinder and do not substitute our judgment for the factfinder's. *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). The factfinder is the sole arbiter of the witnesses' credibility and demeanor. *See id.* at 109 (quoting *In re J.L.*, 163 S.W.3d 79, 86–87 (Tex. 2005)).

ANALYSIS

Issues One and Two: Predicate Grounds

Although Mother does not challenge predicate ground 161.001(b)(1)(O), because Mother challenges the sufficiency of the evidence supporting the trial court's endangerment findings in issues one and two, we consider whether the evidence is sufficient to support terminating Mother's rights under subsections (D)

24

and (E). *See In re N.G.*, 577 S.W.3d at 235–36. If the evidence is sufficient as to one of these grounds plus sufficient evidence exists to support the best interest finding, we will affirm the termination order. *See id.* at 232–33. Since evidence of grounds (D) and (E) is often interrelated, we consolidate our review of these grounds. *See In re J.L.V.*, No. 09-19-00316-CV, 2020 WL 1161098, at *10 (Tex. App.—Beaumont Mar. 11, 2020, pet. denied) (mem. op.).

Subsection (D) allows for the termination of parental rights if clear and convincing evidence supports that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child[.]" Tex. Fam. Code Ann. § 161.001(b)(1)(D). Under subsection (E), parental rights may be terminated if clear and convincing evidence establishes the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]" *Id.* § 161.001(b)(1)(E). The Texas Supreme Court has explained that "'endanger' means to expose to loss or injury; to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987) (citation omitted). To endanger a child, "it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* (citation omitted).

"Subsection D requires the endangerment to the child to be the direct result of the child's environment." *See Interest of J.H.*, No. 09-20-00056-CV, 2020 WL

4516860, at *10 (Tex. App.—Beaumont Aug. 6, 2020, no pet.) (mem. op.) (citation omitted). "Endangerment under subsection (D) arises from a child's environment and a parent's disregard for the potential for danger created by the environment." *In re I.V.H.*, No. 01-19-00281-CV, 2019 WL 4677363, at *5 (Tex. App.—Houston [1st Dist.] Sept. 26, 2019, pet. denied) (mem. op.) (citation omitted). We consider the child's environment before the Department obtained custody in our subsection (D) endangerment analysis. *See In re J.L.V.*, 2020 WL 1161098, at *10. Under subsection (D), termination may be based on a parent's single act or omission. *In re A.B.*, 125 S.W.3d 769, 776 (Tex. App.—Texarkana 2003, pet. denied); *see also In re G.M.S.*, No. 09-24-00207-CV, 2024 WL 4643302, at *8 (Tex. App.—Beaumont Oct. 31, 2024, pet. denied) (mem. op.). It is unnecessary that a parent know with certainty the child is in an endangering environment; instead, awareness of the potential for danger and disregarding the risk is enough to show endangering conduct. *See In re J.H.*, 2020 WL 4516860, at *10.

To terminate a parent's rights under subsection (E), the evidence must "show a conscious course of conduct." *In re C.M.C.*, 554 S.W.3d at 172 (citing *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)); *In re G.M.S.*, 2024 WL 4643302, at *8. In our analysis of subsection (E), we may consider actions occurring before and after a child's birth to establish a "course of conduct." *See In*

*re C.M.C.*, 554 S.W.3d at 172 (citation omitted); *In re G.M.S.*, 2024 WL 4643302, at \*8 (citation omitted).

Evidence of a parent's drug use can establish that the child's surroundings endanger her physical or emotional well-being under subsection (E) and qualify as a "voluntary, deliberate, and conscious course of conduct endangering the child's well-being under subsection (E)." *In re C.V.L.*, 591 S.W.3d 734, 751 (Tex. App.—Dallas 2019, pet. denied) (citation omitted). "Courts may consider whether a parent's drug use continues after the child is removed from the parent's care, as such conduct shows a voluntary, deliberate, and conscious course of conduct that endangers a child's well-being." *In re M.S.*, 662 S.W.3d at 629 (citations omitted); *see also Cervantes-Peterson v. Tex. Dep't of Fam. & Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (noting that mother's continued narcotics use after child's removal in the face of drug testing, jeopardized her relationship with her child). The trial court may infer from refusals to drug test that the parent used drugs. *See In re M.S.*, 662 S.W.3d at 629; *In re K.C.B.*, 280 S.W.3d 888, 895 (Tex. App.—Amarillo 2009, pet. denied) (noting trial court may infer from parent's refusal to submit to drug test that they are using drugs).

"'Sexual abuse is conduct that endangers a child's physical or emotional well-being.'" *In re G.M.S.*, 2024 WL 4643302, at \*8 (quoting *In re K.A.R.*, No. 04-17-00723-CV, 2018 WL 1733147, at \*3 (Tex. App.—San Antonio Apr. 11, 2018, pet.

27

denied) (mem. op.)). The Department need not establish sexual assault, or that the parent was criminally charged or convicted. *Id.* Evidence of sexual abuse of other children is relevant in determining endangerment grounds. *Id.*; *see In re L.J.H.*, No. 05-21-00183-CV, 2021 WL 4260769, at *12 (Tex. App.—Dallas Sept. 20, 2021, no pet.) (mem. op.) "([P]redatory or harmful conduct directed at one child will support termination of parental rights as to a different child, because all children at risk for the same conduct by the same predator are endangered."); *In re K.A.R.*, 2018 WL 1733147, at *3.

"'Domestic violence and a propensity for violence may be considered evidence of endangerment, even if the endangering acts did not occur in the child's presence, were not directed at the child, or did not cause actual injury to the child.'" *In re M.S.*, 662 S.W.3d at 630 (citation omitted); *see also Boyd*, 727 S.W.2d at 533. A parent's abusive or violent conduct or that of other residents of a child's home can create an environment endangering to the child's physical or emotional well-being. *In re M.S.*, 662 S.W.3d at 630; *In re K.A.S.*, 131 S.W.3d 215, 222 (Tex. App.—Fort Worth 2004, pet. denied).

The trial court heard testimony that Mother tested positive for methamphetamines multiple times after the children's removal, which the drug tests admitted at trial also supported. The documentary evidence also established that Mother admitted using cocaine twice a month between 2014 and November 2023,

which was during the time she had her children. She refused to submit to drug testing several times during the case's pendency, which the Court could conclude were positive. Additional evidence established that Mother was found walking with the children along a highway while under the influence of alcohol, once in Florida and once in Texas.

As described above, evidence showed that Amanda made outcries of multiple instances of sexual abuse at the hands of Mother's boyfriends and their family members, and there were concerns about her ability to protect the children. Mother was also arrested with Oliver, one of Amanda's alleged abusers, while the case was pending. The psychological evaluation admitted at trial established that Mother had a history of being in relationships involving domestic violence.

Viewing the evidence in the light most favorable to the trial court's findings, we conclude that the trial court could reasonably have formed a firm belief or conviction that Mother knowingly placed or knowingly allowed Amanda, Jacob, and Sue to remain in conditions or surroundings which endangered their physical or emotional well-being and engaged in conduct or knowingly placed them with persons who engaged in conduct that endangered their physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *In re J.F.C.*, 96 S.W.3d at 266; *In re J.O.A.*, 283 S.W.3d at 345; *Boyd*, 727 S.W.2d at 533; *In re G.M.S.*, 2024 WL 4643302, at *8; *In re M.S.*, 662 S.W.3d at 631; *In re K.A.S.*, 131 S.W.3d at

222; *In re J.T.G.*, 121 S.W.3d at 125; *In re K.A.R.*, 2018 WL 1733147, at *3. Thus, the Department established, by clear and convincing evidence, that Mother committed the predicate acts enumerated in sections 161.001(b)(1)(D) and (E). *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E); *In re M.S.*, 662 S.W.3d at 631. We overrule Mother's issues challenging the legal and factual sufficiency of the evidence supporting predicate acts under subsections (D) and (E).

Issue Three: Best Interest

Mother also challenges the legal and factual sufficiency of the evidence supporting the trial court's best interest finding. "Trial courts have wide latitude in determining the child's best interest." *In re H.S.*, No. 09-23-00002-CV, 2023 WL 4013305, at *9 (Tex. App.—Beaumont June 15, 2023, pet. denied) (mem. op.) (citing *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982)). "There is a strong presumption the child's best interest is served by keeping him with his parent." *Id.* (citations omitted); *see In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (citing Tex. Fam. Code Ann. § 153.131(b)); *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see also* Tex. Fam. Code Ann. § 153.131(b). We presume that prompt and permanent placement of the child in a safe environment is in the child's best interest. *See* Tex. Fam. Code Ann. § 263.307(a).

The Family Code outlines factors to consider in determining whether a parent is willing and able to provide a safe environment for the children. *See id.* §

263.307(b). Several other non-exclusive factors may be considered in a best interest analysis, including: (1) the desires of the children; (2) the emotional and physical needs of the children now and in the future; (3) the emotional and physical danger to the children now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the children; (6) the plans for the children by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may suggest that the existing parent-child relationship is not a proper one; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018) (characterizing the *Holley* factors as "non-exclusive"). "No particular *Holley* factor is controlling, and evidence of one factor may be enough to support a finding that termination is in the child's best interest." *In re H.S.*, 2023 WL 4013305, at *9 (citations omitted); *see also In re C.H.*, 89 S.W.3d at 27.

In our best interest analysis, we consider circumstantial evidence, subjective factors, and the totality of the evidence. *See In re H.S.*, 2023 WL 4013305, at *9; *In re N.R.T.*, 338 S.W.3d 667, 677 (Tex. App.—Amarillo 2011, no pet.). A parent's past conduct is relevant to determining the parent's present and future ability to care for a child. *See In re C.H.*, 89 S.W.3d at 28; *In re H.S.*, 2023 WL 4013305, at *9.

Evidence supporting the statutory grounds for termination may also support a best interest finding. *See In re C.H.*, 89 S.W.3d at 28; *In re H.S.*, 2023 WL 4013305, at *9.

We have explained the evidence established Mother's drug use, history of relationships involving domestic violence, walking with the children along a highway twice while under the influence of alcohol, prostitution, and lack of protectiveness particularly with Amanda's sexual abuse allegations. The record established that Mother failed to obtain steady employment or stable housing. The evidence showed that Mother failed to complete services, and failed to complete the substance abuse program at Santa Maria, where Rendon testified they had Spanish speakers. Additionally, the caseworker and Mother described Mother's inappropriate behavior at times during Mother's visits with the children. Finally, the evidence established that Mother wanted the children placed with an individual who enabled Mother's prostitution. Mother testified that she relied on various men for her financial needs and had not worked much since coming to the United States. Mother lived in her vehicle at times and made no progress in obtaining employment or stable housing. When asked whether she believed Amanda about the sexual abuse allegations, she responded, "Now I do." From that statement the trial court could have reasonably inferred that Mother did not believe Amanda when she initially made her outcry.

32

Although evidence of placement plans and adoption are relevant to best interest, a lack of evidence about definitive plans for permanent placement and adoption by the Department are not dispositive. *In re C.H.*, 89 S.W.3d at 28; *In re H.S.*, 2023 WL 4013305, at *10. "Rather, based on the entire record, we ask if a factfinder could reasonably form a firm conviction or belief that termination of the parent's rights is in the children's best interest—even if the agency cannot precisely identify the children's future home environment." *In re H.S.*, 2023 WL 4013305, at *10 (citing *In re C.H.*, 89 S.W.3d at 28). Amanda, Jacob, and Sue remained in foster care at the time of trial, but evidence showed the Department and CASA felt it was important to keep the children together. Further, the evidence established that all three children improved significantly while in the Department's care. The caseworker and CASA explained that the children required therapy and summer school. Additionally, Amanda required accommodations at school and medication. The caseworker and CASA testified that it was in the children's best interest for Mother's rights to be terminated.

Considering the evidence related to best interest, deferring to the trial court's determinations on witness credibility, the resolution of conflicts in the evidence, and the weight given to the testimony, we conclude that the statutory and *Holley* factors weigh in favor of the trial court's finding that termination is in Amanda's, Jacob's, and Sue's best interest. *See* Tex. Fam. Code Ann. §§ 161.001(b)(2), 263.307(a), (b);

33

*Holley*, 544 S.W.2d at 371–72; *In re H.S.*, 2023 WL 4013305, at *10. The trial court could have reasonably formed a firm belief or conviction that termination of Mother's parental rights was in the best interest of all three children. *See In re C.H.*, 89 S.W.3d at 28; *In re H.S.*, 2023 WL 4013305, at *10. We overrule Mother's issue challenging the sufficiency of the evidence to support the best interest finding.

Issue Four: Conservatorship

In issue four, Mother challenges the legal and factual sufficiency of the evidence to support the Department's appointment as managing conservator, arguing family members sought placement, and no evidence was admitted supporting the Department's appointment as conservator. Mother also contends that "[b]ut for" her "wrongful termination, the Department would not be appointed sole managing conservator of the children."

The trial court's termination order states that it appointed the Department as permanent managing conservator and found "that the appointment of the Respondents as managing conservator of the children is not in the child's best interest because the appointment would significantly impair the child's physical health or emotional development." These findings track those required by Family Code section 153.131, which supports our conclusion that the trial court appointed the Department as the managing conservator under Chapter 153. *See* Tex. Fam. Code Ann. § 153.131; *In re H.S.*, 2023 WL 4013305, at *10; *In re L.M.*, No. 09-22-00307-

34

CV, 2023 WL 2418912, at *5 (Tex. App.—Beaumont Mar. 9, 2023, no pet.) (mem. op.) (determining same). When a trial court appoints the Department as the child's managing conservator based on its authority under Chapter 153, the parent must challenge the trial court's appointment of the Department as the child's managing conservator to preserve a challenge. *See In re J.A.J.*, 243 S.W.3d 611, 615–17 (Tex. 2007) (explaining that parent must raise an issue on appeal challenging trial court's Department's appointment when the findings show it was appointed under Family Code section 153.131, as a challenge based on those findings is not subsumed by a parent's claim that terminating the parent-child relationship is not in the child's best interest); *In re H.S.*, 2023 WL 4013305, at *10; *In re L.M.*, 2023 WL 2418912, at *4 n.22. To the extent Mother challenges the Department's appointment as conservator under Chapter 153, the evidence as outlined in our analysis of Mother's other issues supports the trial court's finding that appointment of the parents as permanent managing conservators "[is] not in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development[.]" *See* Tex. Fam. Code Ann. § 153.131(a). Given the testimony from multiple witnesses that all three children had improved significantly since being removed from Mother and placed in the Department's conservatorship, we disagree with Mother's characterization that no evidence was admitted supporting the Department being named managing conservator.

Finally, section 161.207 of the Texas Family Code provides that if the trial court terminates the parent-child relationship with respect to both parents, the Court shall appoint a suitable, competent adult, the Department, or a licensed child-placing agency as managing conservator of the child. *Id.* § 161.207(a). Here, the trial court terminated the parental rights of all parents, although Mother is the only party who appealed. Having affirmed the trial court's judgment terminating Mother's parental rights, any challenge to the conservatorship appointment under 161.207 was subsumed in the issues related to the termination of her parental rights. *See In re D.N.C.*, 252 S.W.3d 317, 318 (Tex. 2008); *In re T.J.*, No. 09-22-00224-CV, 2022 WL 17491817, at *5 (Tex. App.—Beaumont Dec. 8, 2022, pet. denied) (mem. op.). We overrule issue four.

## CONCLUSION

Having overruled Mother's issues, we affirm the trial court's termination order.

AFFIRMED.

W. SCOTT GOLEMON<br>
Chief Justice

Submitted on December 18, 2024
Opinion Delivered January 16, 2025

Before Golemon, C.J., Johnson and Chambers, JJ.